## SAWYER VS. THE DODGE COUNTY MUTUAL INSURANCE COMPANY.

INSURANCE. (1, 2, 3) *Policy construed. Term " grain in stack " includes grain raised and stacked on land purchased after policy taken out.* (4) *Open policies, insuring future, material productions in course of industry of assured, not wager policies, and valid.*

37 503
79 220
37 503
88 520
37 503
108 233
37 503
52 LRA 339
52 LRA 340n

1. In the application upon which a policy of insurance against fire was based (which application was by the terms of the policy made a part thereof), the property to be insured, and the insured value thereof, were described as follows (a printed form furnished by the insurer being apparently used for the purpose): " Main barn, east of new barn, $500; hay therein or in stack within ten rods of the farm buildings; grain therein or in stack; farming utensils therein; live stock therein or running at large, $200; on barn No. 2; hay therein or in stack within ten rods of farm buildings; grain therein or in stack; farming utensils therein; live stock therein or running at large; granary and wagon house, $300; grain therein or in stack, $300; farming utensils therein; total, $1,300. In the town of Chester in the county of Dodge, state of Wisconsin. Description of land on which buildings stand — sec. 19, town 13, range 15." In the policy the description of the property and the insured value is: " Five hundred dollars on his main barn; two hundred dollars on his live stock therein and when running at large; three hundred dollars on his granary and wagon house; *three hundred dollars on his grain therein or in stack."* The risk was for five years. When the policy was issued, the assured owned and occupied a farm in the town of Chester, on secs. 17, 19 and 20, being a single tract of land and containing 380 acres. A few months later he purchased an additional twenty acres in said sec. 17, but not adjoining his other lands. Afterwards he raised and stacked wheat on said additional tract; and this action was brought on the policy for the value of such stacks, which had been destroyed by fire. *Held,*

(1) That the policy is to be interpreted by the same rules which determine the effect of any other contract.

(2) That the application for the policy is to be considered a part of the contract of insurance.

(3) That at least all *latent* ambiguities in the contract may be explained by extrinsic evidence.

(4) That the maxim that " general words may be aptly restrained according to the subject matter or person to which they relate," is

Sawyer vs. The Dodge County Mutual Insurance Company.

justly applicable to this contract; and that *some limitation* is to be put upon the words " grain in stack."

(5) That as plaintiff, when he took the policy, was engaged in the business of *raising* grain, and was not dealing in it in any other way, the risk as to grain should perhaps be limited to such as was *raised by him.*

(6) That, taking all the words and provisions of the application and policy together, and all the facts above stated, there is no ground for restricting the words "grain in the stack " further than to grain raised and stacked (by the assured) in the town of Chester.

(7) That defendant is therefore liable for the value of the stacks of grain described in the complaint.

2. The fact that in the printed form of application furnished by the company there is a limitation inserted as to " hay in stack," which is entirely omitted from the specification as to "grain in stack," favors the construction of the contract above given.

3. The specification as to " live stock running at large " cannot reasonably be limited to live stock running at large *on section* 19, and this also favors the view that the words "grain in stack " are not to be limited to grain stacked in that section.

4. Fire insurance, on time, by open policies, of the *future* material productions of the assured in the course of his business, in his trade or calling, are valid contracts of indemnity, and not wager policies. And the policy in suit is valid as applied to the loss for which a recovery is here sought, although the grain destroyed was raised by plaintiff upon land acquired by him *after the date of the policy.*

APPEAL from the Circuit Court for *Dodge* County.

Action on an insurance policy for the loss of a quantity of wheat in stacks. The defendant had judgment dismissing the complaint with costs, and the plaintiff appeals.

The material portion of the policy is as follows: " The Dodge County Mutual Insurance Company, Waupun, Wisconsin, in consideration of nineteen 50–100 dollars, by the said company received, do insure *B. C. Sawyer*, of the town of Chester, county of Dodge and the state of Wisconsin, against loss or damage by fire or lightning, to the amount of thirteen hundred dollars, on the following described property, viz: Five hundred dollars on his main barn, east of new barn. Two hundred dollars on his live stock therein, and when running at

large. Three hundred dollars on his granary and wagon house. Three hundred dollars on his grain therein, or in stack." The insurance was for the term of five years from the date of the policy. The wheat was burned August 26, 1872, and was of the value of over $300. It was raised by the plaintiff, and stacked, upon land in the town of Chester, owned by him when the wheat was burned, but not when the policy was issued. Due notice was given and proofs of loss were furnished to the defendant, as required by the terms of the policy. The application of the plaintiff upon which the policy was issued, contains the following specifications : "In the town of Chester, county of Dodge, state of Wisconsin." "Description of land on which buildings stand, sec. 19, town 13, range 15."

The cause was tried by the court (a jury trial having been duly waived), and the court found the above facts from the evidence, and also found as follows : "5th. At the time the fire occurred, the plaintiff had and owned, in stacks upon his farm in section 19, described in the application for the said policy, grain in stacks of a greater value than the sum of three hundred dollars, and these stacks were situated within about ten rods of the main barn mentioned in said policy. 6th. At the time of issuing the policy, the plaintiff owned land in section seventeen above mentioned, but not adjoining the premises above described on which the stacks of grain which were destroyed by fire were situated, and a distance of one hundred rods intervened between the two pieces of land."

Upon the foregoing facts (concerning which there is no dispute), the court below held that the defendant was not liable for the loss. From judgment on the finding the plaintiff appealed.

The cause was first argued in this court at the June term, 1874.

*Elwell & Lander*, for appellant, argued that there was nothing in the policy nor application, as to where the grain should be grown or stacked, except that it should be in the town of Ches-

ter. The language of the policy is that of the company, and is to be taken in a sense most favorable to the assured. Flanders on Ins., 72. And any doubt arising on the construction should be resolved in his favor. 1 Phillips on Ins., § 1163 ; *Grant v. Lex. Ins. Co.*, 5 Ind., 23 ; *Hoffman v. Ætna Ins. Co.*, 32 N. Y., 405. The policy was to run through a series of years, and contemplated, as a matter of course, that in some years the quantity of grain would be larger than others, and so with regard to the number of acres cultivated, so that the risk of the insurer would be greater or less. The policy is not limited to the crop of any single year, but runs on and attaches to each succeeding crop as it is gathered into stack, and in this respect is like a policy on a retail or wholesale stock of goods, which is held to attach to the goods successively in the store, as the stock is sold out and replenished. *Hooper v. Hudson River Ins. Co.*, 17 N. Y., 424.

*Dixon, Hooker & Palmer*, for respondent :

The stacks destroyed were not situate upon land owned by the plaintiff and described in the policy, but upon a portion of section 17, in the same town, the title of which was acquired by the plaintiff *after the policy was issued* — in May, 1871. The plaintiff had on his farm described in the policy, grain in the stack, or in the granary in value exceeding $300, as he himself testifies. The sole question presented on this appeal is whether the "three hundred dollars on his grain therein or in stack," means, or can be applied to the stacks in question. The circuit court held that the policy did not cover this property, and we think the court was clearly right. Both the language of the policy and every circumstance connected with the transaction, forbid any other construction. Contracts are to be construed according to the intent of the parties, and the intent here is very plain. This is not a floating policy — one which the plaintiff can shift to every stack of grain in the town or county, if he happens to own them all, and any are destroyed by fire — thus increasing the risk of the company five hundred or

one thousand fold, with no corresponding benefit on its part or premium paid proportionate to the increased risk. Such a construction would be monstrous, against all law and all reason. The company insured the grain in stacks and in the granary upon the premises owned and occupied by the assured and described in the policy, and for such grain the risk still continues, but for no other. .

LYON, J. The contract of insurance in respect to the wheat in stack named in the policy is not limited by the terms thereof to wheat stacked within the curtilage of the buildings insured, or either of them, nor to wheat grown or stacked on section 19, nor yet to wheat grown or stacked on lands which the plaintiff owned when the policy was issued, but is, in terms, an agreement by the defendant to insure the plaintiff for five years, in the sum of three hundred dollars, against loss or damage, by fire or lightning, to his wheat in stack in the town of Chester. Had the defendant desired to limit its risk to wheat grown on a particular section or stacked in a particular place, it could have done so very easily by inserting a provision to that effect in the policy. Not having done so, the contract admits of but one construction, which is, that it includes any wheat of the plaintiff in stack in the town of Chester, without regard to the section on which it was grown or the place where it was stacked. To give it any other construction would be to interpolate in the contract conditions and limitations which the parties to it did not place there, and to which they have not assented.

We are clearly of the opinion that the policy of insurance covered and included the wheat of the plaintiff, which was burned, and hence, that the circuit court erred in giving judgment for the defendant.

The judgment must be reversed, and the cause remanded with directions to the circuit court to give judgment for the plaintiff for the sum demanded in the complaint.

A motion was made for a rehearing at the June term, 1874.
*L. S. Dixon*, of counsel for respondent, for the motion :

1. It is most respectfully insisted that the court is in error
in the construction given to the policy, in supposing that in the
contract of insurance it requires express words of limitation in
the policy itself, or the application, in order to confine its ope-
ration to any particular property as being the subject of the
contract. The theory of the opinion is, that without such ex-
press and particular words limiting the operation of general
ones in the policy and application, no such limitation can ex-
ist; and that the court is bound to give the most rambling and
unbounded effect to general words, of which the nature of such
words will admit, regardless of every other fact, circumstances
or consideration. We are informed in the opinion that "had
the defendant desired to limit its risk to wheat grown on a par-
ticular section, or stacked in a particular place, it could have
done so very easily by inserting a provision to that effect in
the policy." No doubt such provision might have been in-
serted, but the question is whether, upon the true rules for the
interpretation of contracts, it was necessary for the defendant
to insert it in order not to assume liability for the loss to the
extent of $300, on every stack of wheat in the town of Chester
for the period of five years, in case the plaintiff should own
every such stack. The court decides that without express
words of limitation contained in the policy itself, such was the
contract and such the construction which it must receive, and
rests its judgment upon this as the sole principle of interpreta-
tion by which general words in this and every other policy of
insurance are to be expounded. It is not so expressly stated
in the opinion, but one would suppose, and I think the infer-
ence to be just and fair, that the court intends to and does
hold that contracts of insurance are not, in this particular at
all events, to be governed by the same rules of construction
which apply to and determine the operation and effect of every
other contract. Let us examine this proposition first. We

JANUARY TERM, 1875. 509

Sawyer vs. The Dodge County Mutual Insurance Company.

say that the rules for the interpretation of contracts of this kind are the same as those which govern in other mercantile contracts; with this difference only, that where, after the application of these rules, there still exists any fair and reasonable doubt as to the meaning of the whole instrument or the meaning of particular words, such doubt is to be resolved in favor of the assured and against the company. Really doubtful words, those which are so after all other sound rules of interpretation have been applied, are to be construed most strongly against the party using them, to wit, the insurance company. In support of this position, we respectfully direct the attention of the court to the following authorities, selected almost at random, but the first of which is from a court well known to hold the most stringent rules against insurance companies. "As to the first branch of plaintiff's instruction" (an instruction giving a construction to the language of the policy), says BREEZE, C. J., in *Aurora Fire Ins. Co. v. Eddy*, 49 Ill., 107, "we have always understood that the rules by which a policy of insurance is to be construed, and the principles by which it is to be governed, do not differ from other mercantile contracts, but conditions and provisions in such policies are to be strictly construed against the underwriters, for the reason that they tend to narrow the range, and limit the force of the principal obligation." "The same rules of construction by which the sense and meaning of all other instruments are determined, apply equally to policies of insurance; yet policies are to be construed liberally for the benefit of the insured, and if any doubt should arise as to the meaning of the whole instrument, greater effect should be allowed to the written than the printed words." *Mobile Marine, etc., Ins. Co. v. McMillan*, 27 Ala., 77. The following is an extract from the opinion of CHILTON, C. J., on pages 98 and 99 of the same case: "'It is certain,' said LEE, C. J., in *Pelley v. Royal Ex. Insurance*, 1 Burr., 349, 'that in construing policies, the *strictum jus* or *apex juris*, is not to be laid hold on; but they are construed largely for the benefit of trade and for

the insured.' Nevertheless, as was said by Lord ELLENBOR-
OUGH, C. J., in *Robertson v. French*, 4 East, 135, 136, ' the same
rules of construction which apply to all other instruments, ap-
ply equally to this instrument or policy of insurance, namely,
that it is to be construed according to its sense. and meaning,
as collected in the first place from the terms used in it, which
terms are themselves to be understood in their plain, ordinary,
and popular sense, unless they have generally, in respect to the
subject matter, as by the known usage of trade, or the like,
acquired a peculiar sense, distinct from the popular sense of
the same words; or unless the context evidently points out,
that they must in the particular instance, and in order to effec-
tuate the immediate intention of the parties to that contract, be
understood in some other special and peculiar sense.' "

Again, it will be seen from the policy annexed to the record
that the application is referred to and made a part of it, and
where this is so, it forms a part of the contract, and the applica-
tion is to be read and construed in connection with the policy.
*Babbitt v. The Liverpool, etc., Insurance Co.*, 66 N. C., 70; *Clin-
ton v. The Hope Insurance Co.*, 51 Barb., 647. It being estab-
lished that contracts of insurance are not *sui generis* and not to
be construed by rules differing from those governing other
mercantile contracts, I wish to call the attention of the court
to two or three general rules of interpretation not considered
by the court in the adjudication of this case, and which, if
they had been considered, must inevitably, as it seems to me,
have led to the entirely opposite conclusion respecting the con-
struction of the contract and the property covered, or intended
to be by the policy. The rule laid down by Mr. Sedgwick
(Stat. and Const. Laws, p. 432 ; ed. 18—, p. 422 ; ed. 1857, —)
is of the first importance in giving a construction to the words
of a contract like those here under consideration. " It is,"
says the author, " a general and very sound rule, applicable to
the construction of every statute, that it is to be taken in ref-
erence to its subject matter. In this way the operation of gen-

eral words may be limited." See also Smith's Com., p. 654. It is the same principle enunciated by Lord BACON in his maxim: *Verba generalia restringuntur ad habilitatem rei vel personam.* "General words may be aptly restrained according to the subject matter or person to which they relate." This is a rule of universal application, as well in the interpretation of contracts as of statutes, in proof of which I cite the words of Lord BACON where he says: "for all words, whether they be in deeds, or statutes, or otherwise, if they be general, and not express and precise, shall be restrained unto the fitness of the matter and the person." Such is the language of Lord BACON as extracted by Mr. Broom (Legal Maxims, pp. 475–6, ed. 1868, marginal paging, 620–21), by whom this rule of construction is ably treated. If not already familiar with them, I commend the court to examine the comments of Mr. Broom, under the maxim above quoted, and I particularly invite the attention of the court to the cases of *Gillespie v. Palmer*, 20 Wis., 544, and *Sanford v. Prentice*, 28 id., 358, where this maxim was applied in restraint of general words found in the constitution and statutes of this state. Mr. Sedgwick, at the close of his chapter VI, entitled "General Rules for the Construction of Statutes," gives the rules of Vattel, Domat, Lieber and others, from which I extract the language of Vattel, as follows: "Restrictive interpretation, which is the reverse of extensive interpretation, is founded on the same principle. As we extend a clause to those cases which, though not comprised within the meaning of the terms, are nevertheless comprised within the intention of that clause, and included in the reasons that produced it, in like manner we restrict a law or promise contrary to the literal signification of the terms, our judgment being directed by the reason of that law or that promise; that is to say, if a case occurs to which the well known reasons of a law or promise is utterly inapplicable, that case ought to be excepted, although, if we were barely to consider the meaning of the terms, it should fall within the

purview of the law or promise. It is impossible to think of everything, to foresee everything, and to express everything; it is sufficient to enounce certain things in such a manner as to make known our thoughts concerning things of which we do not speak; and, as Seneca, the rhetorician, says, there are exceptions so clear that it is unnecessary to express them.   *   * We have recourse to restrictive interpretation in order to avoid falling into absurdities." Again, Professor Lieber says: "Honest, faithful, *bona fide* interpretation is all important; common sense must guide us." "Words are always to be understood as having regard to the subject matter." I conclude, therefore, that there is some limitation to be put upon the words, "his grain in stacks," although, as stated in the opinion, it "is not limited by the terms thereof to wheat stacked within the curtilage," etc., "nor to wheat grown or stacked on section 19." In accordance with the above cardinal rule of interpretation, which is so well settled and so well understood, and which, as has been shown, applies to all general words in all statutes and all contracts. I insist that the words, "grain in stack," though general, are to be aptly restrained according to the subject matter to which they relate, and which was contemplated by the parties at the time the contract was entered into. "If I grant common," says Mr. Broom, *supra*, "in all my lands in D., if I have in D. both open grounds and several, it shall not be stretched to common in my several grounds, much less in my garden or orchard. So, if I grant J. S. an annuity of £10 a year, *pro concilio impenso et impendendo* (for past and future counsel), if J. S. be a physician, this shall be understood by his advice in physic, and if he be a lawyer, of his counsel in legal matters."

Though a release be general in its terms, its operation will, at law, in conformity with the doctrine recognized in courts of equity, be limited to matters contemplated by the parties at the time of its execution. *Lyall v. Edwards*, 6 H. & N., 337. And if the court will take the trouble to examine the case of

JANUARY TERM, 1875.     513

Sawyer vs. The Dodge County Mutual Insurance Company.

*Baines v. Holland*, 10 Exch., 805, argument of Willes and the opinion of the court by PARKE, B., p. 807, it will see that the maxim was there applied to the contract of insurance.   Now, if the court please, what are the primary rules or principles by which courts are guided in arriving at the intention of the parties to a contract, either as to the subject matter of it, or to its meaning in any other particular where the words employed are general or in any manner ambiguous or susceptible of different application?   The object of all rules is, of course, to arrive at the intention of the parties, what they contemplated, and when that is found it must govern.   These rules are as well settled by the decisions of this court as by those of any other in the land.   *Ganson v. Madigan*, 15 Wis., 144–154. And I call attention particularly also to the language by Mr. Justice COLE, in *Prentiss v. Brewer*, 17 id., 642, and the authorities there cited.

Now in the present case, the parol evidence, showing the situation and circumstances of all the parties and all the surrounding facts necessary to point out and declare, as it seems to me, with most unerring certainty, the subject matter of this particular clause, that is, what "grain in stack" was intended, what contemplated by the parties, was given by the testimony of *Mr. Sawyer* himself, as a witness upon the stand.   It was shown that he owned, at the time the contract was made, the farm on which the buildings and other property secured against loss by the policy were situated, and that it was customary and usual, then and afterwards, for him to have grain raised upon that farm in stack and in his barns upon the same premises.   It was also shown that he did not then own the land on which the grain in controversy was raised, or the stacks stood. It was shown that he purchased this land more than half a year afterwards.   It was not shown that he had at that time any interest whatsoever, present or prospective, absolute or contingent, qualified or unqualified, in this land on which the wheat was grown and the stacks destroyed.   It is not pretended

even that he had any such interest, or that he expected at that time ever to acquire one. Can this court say, under the circumstances, that *Mr. Sawyer* contemplated or intended at the time of taking out the policy that he was obtaining insurance against loss by fire of these stacks of grain, so raised and so situated upon lands which he did not then own, and never hitherto, nor for many months afterwards, had expected to own? Can this court say that these stacks were the subject matter of insurance, which was contemplated under the general designation of "grain in stack," when he made his application, paid his money, and took out the policy? Can this court rather not say with absolute certainty, that it is not the "grain in stack" which he contemplated or intended? If the court is satisfied, placing itself in the attitude of the parties, at the time the contract was made, and viewing the transaction as they must have viewed it, that such was not the intention of the parties, is the court not bound so to declare by its judgment? If a merchant owning a store on East Water street should take out a policy of insurance on "his store on East Water street, in the city of Milwaukee," for the period of five years, the insured owning but one store on the street, such description or designation of the property in the policy would be good. *Id certum est quod reddi certum potest.* Proving that he had but one store, the policy, in case of loss, would be applied to that. If the merchant whose store, or whose stock of goods in a store, is so insured, should afterwards buy one hundred and fifty stores, or stocks of goods in stores, on the same street to which the words of the policy ("by the terms thereof," in the language of this court) are equally applicable, would such policy become a contract of insurance, covering any one of the one hundred and fifty stores or stocks of goods which should thereafter be destroyed by fire within the period limited by the policy? Would this court, shutting its eyes to all the facts and circumstances attending the transaction, and blindly ignoring every other rule for the interpretation of contracts, except

that requiring it to look at the words themselves, so hold and so apply the contract to any one of the after purchased stores or stocks of goods as being the proper subject matter of the contract contemplated and intended by the parties at the time by the general words used in it, "his store or his stock of goods in a store on East Water street, in the city of Milwaukee?" The rule of construction adopted and acted upon in this case would require it so to hold. It is the precise rule upon which this case has been decided. This subject is capable of illustrations without limit, as if the description should be, "his store in the fourth ward of the city of Milwaukee," "his store in the city of Milwaukee," "his store in the county of Milwaukee;" or, to make the description a little more specific, but still general, as applicable to a large class of objects, "his brick store in the city of Milwaukee," etc. If this construction be correct, it is certainly a most convenient method of obtaining insurance upon any number of stores, or any number of stocks of goods, or any number of stacks of grain, or any number of articles of any other kind of property designated by the same general name, or answering the same general description, by paying the premium necessary to insure one such store or one such article of property.

I have endeavored to show that contracts of this nature are subject to the same general rules of interpretation as other written contracts. If, instead of a contract of insurance, this had a been a contract for the sale of the property described in the policy, the same facts being shown respecting the situation of the parties and the surrounding circumstances, would this court hold that the plaintiff sold, or that the purchaser bought, any grain in stack owned by the plaintiff, in the town of Chester or the county of Dodge? If A contracts with B for the purchase of "his store on East Water street, in the city of Milwaukee," the same to be paid for, and deed executed on or before the expiration of five years, can B, owning one such store at the time of contracting, purchase a dozen more, and compel

A to accept any one of them at his (B's) election, in fullfilment of the contract? The words of the contract, the court will bear in mind, would be as applicable to any one of these stores as to that which B owned at the time of contracting. Under the rule of construction adopted in this case, the court would be bound so to hold; for, says Mr. Justice LYON, "to give it (the contract) any other construction would be to interpolate in the contract conditions and limitations which the parties did not place there, and to which they have not assented." With the greatest deference, this sounds like very strange doctrine to me. It is requiring us to do what Mr. Vattel said was impossible — "to think of everything, to foresee everything, and to express everything."

2. The maxim *noscitur a sociis* applies here and should determine what "grain in stack" was intended. In *Watchorn v. Langford*, 3 Campb., 422, a person, not a linen draper, insured his "stock in trade, household furniture, linen, wearing apparel and plate." A fire happened in plaintiff's premises and consumed, amongst other things, a large stock of linen drapery goods, which a short time before he had purchased on speculation. One item of the plaintiff's demand was for the value of those goods, which it was contended, were covered by the policy under the denomination of "linen." Here, the court will observe, was a general term "linen," not expressly restrained or qualified by any words in the policy, and which, literally applied, covered the goods destroyed. According to the rule adopted by your honors and which consists in shutting out from your consideration everything but the literal meaning of the words, the policy covered the linen there destroyed. But what did Lord ELLENBOROUGH say? "I am clearly of opinion that the word 'linen' in the policy does not include articles of this description. Here we may apply *noscitur a sociis*. The preceding words are 'household furniture,' and the succeeding 'wearing apparel.' The 'linen' must be 'household linen or apparel.'" In that case it will be observed

that the plaintiff was a trader, and that the policy covered his stock in trade, but he was not a trader in linen. The words of the policy here are: " Three hundred dollars on his granary and wagon·house. Three hundred dollars on his grain therein. or in stack." " Description of land on which buildings stand, sec. 19, town 13, range 15." The grain in the granary was grain upon the premises described in the policy, and *noscitur a sociis*, the grain in stack was intended to be grain upon the same premises also. The intention of the parties could hardly have been made more plain except by the introduction of an express limitation in words, which, under this rule of construction was clearly unnecessary.

3. Our last point in support of the motion for a rehearing is that this policy under the construction given to it by the court is a wager policy — one in the subject matter of which the insured had no interest and ran no risk, and was therefore void. Such would have been the character of the policy had it in terms purported to have been insurance upon grain or crops grown upon lands of which the assured was not the owner, and in which he had no present interest. If the court will turn to May on Insurance, and read from sections 74 to 85 inclusive, and especially examine the cases of *Crawford v. Hunter*, 8 Term R., 13; *Lucena v. Craufurd*, 3 Bos. & Pul., 75, 1 Taunton, 325, it will find, I think, this proposition to be well sustained. The rule respecting an insurable interest is, that the assured must either have a right in the property, or a right derivable out of the property by virtue of some contract relative thereto, or he cannot insure. A policy of insurance against loss by fire of any grain which the assured may own next year or which may be produced upon lands which he shall own next year, he being without a scintilla of present interest in the grain or the land, is simply void. Things in expectancy cannot be insured unless the party owns that out of which they are expected to issue. Insurable interest is very like assignable interest, if not the very same thing. See opinion of Mr. Justice COLE, in

*State ex rel. v. Hastings*, 15 Wis., 77, 78.    To have an insurable interest in that which is to come into existence after the policy is issued, the party insured must have some present interest in that from which the thing insured is to be derived; if it be hay or grain, he must own or have an interest in the land from which it is to be produced, or if it be a stock of goods, he must own or be actually interested in the goods from which the future goods are to be derived, or which are considered as producing such goods.    It seems, therefore, that Judge PULLING was not so far wrong when he held that the grain must have been produced on the farm owned by the plaintiff at the time the policy issued.    I think it will be found that he was strictly correct.    But this point is made so plain by Mr. May, and the authorities to which he refers, that I deem it better to leave it with the court without further comment.

LYON, J.    In the consideration of motions for the rehearing of causes decided by this court, it rarely happens that we are able to concur in so many of the positions maintained by counsel for the motion, as we can in the present case.

We agree that this policy of insurance is to be interpreted by the same rules which determine the effect of any other contract.    We so held at the present term in *Webster v. The Phœnix Ins. Co.*, 36 Wis., 67.    If there are cases where different rules of construction should be applied to an insurance policy, this case is not one of them, and was not decided upon the hypothesis that it is such a case.

We also agree that the application for the policy is part of the contract of insurance.    Our former decision was based upon a clause in the application not found in the policy.    Indeed, it is expressly stated in the policy that the application is to be considered a part thereof.

We further agree that it is a maxim of the law that "general words may be aptly restrained according to the subject matter or person to which they relate." *Verba generalia restrin-*

*guntur ad habilitatem rei vel personæ.* This maxim, and others which may be referred to hereafter, we recognize as "*legum leges*," and our endeavor is so to apply them in this and all other cases, that, in the words of Lord BACON, there shall be no decline "from a good temper of justice."

We still further agree that *some* limitation is to be put upon the words "grain in stack," employed in the policy, and that such limitation is to be measured by the intention of the parties to the contract. Also, that at least all latent ambiguities in the contract may be explained by parol evidence, or evidence *aliunde* the written agreement.

Thus far we are in most pleasant accord with the learned counsel who prepared the argument in support of the motion for a rehearing. But when we come to apply the foregoing principles to this case, having due regard for other principles equally binding, and which we deem applicable thereto, we find ourselves unable to adopt the conclusions of the counsel. We here reach the point of divergence.

At the risk of some repetition, but for the purpose of more readily comprehending the facts of the case, it may here be stated that, in the application upon which the policy of insurance was issued, the property insured is described and located as follows:

| | Estimated value. | Insured value. |
| --- | --- | --- |
| Main barn east of new barn, - - - - | $750 . | $500 |
| Hay therein or in stack within 10 rods of farm build'gs | ............ | ........ |
| Grain therein or in stack, - - - - | ............ | ........ |
| Farming utensils therein, - - - - | ............ | ........ |
| Live stock therein or running at large, - - | ............ | 200 |
| On barn No. 2, - - - - - | ............ | ........ |
| Hay therein or in stack within 10 rods of farm build'gs | ............ | ... .... |
| Grain therein or in stack, - - - - | ............ | ........ |
| Farming utensils therein, - . - - | ............ | ........ |
| Live stock therein or running at large, - - | ............ | ........ |
| Granary and wagon house, - - - - | ............ | 300 |
| Grain therein or in stack, - - - - | ............ | 300 |
| Farming utensils therein, - - - - | ............ | ........ |
| Am't 1½ per cent., $19.50. | | $1,300 |

In the town of Chester, in the county of Dodge, state of Wisconsin. Description of land on which buildings stand — sec. 19, town 13, range 15.

When the policy was issued, the plaintiff owned and occupied a farm in said town of Chester, on sections 17, 19 and 20, being a single tract of land and containing about 380 acres. A few months later, he purchased an additional twenty acres on section 17, but the same does not adjoin his other lands. It does not appear whether he contemplated this purchase, or had commenced any negotiations in respect thereto, when the insurance was effected. In 1872, the plaintiff raised and stacked wheat on this twenty acres. These stacks were burned in August of that year, which is the loss for which this action was brought.

We held that the stacks thus burned were included in the risk of the policy, and that the defendant, the insurance company, is liable for the loss to the extent of the risk taken by it on grain in stack. We are now called upon to review that decision.

In his very able argument in support of the motion for a rehearing, the learned counsel for the defendant claims and insists that we have overlooked two maxims of the law applicable to the case, and which, if applied thereto, will necessarily lead to the affirmance of the judgment of the circuit court. These are 1st, *Verba generalia*, etc., above quoted; and 2d, *Noscitur a sociis*. It is claimed that the application of the first of these will exclude from the policy any stacks of grain grown and stacked on land in which the plaintiff had no interest when the same was issued; and that the other maxim restricts the risk to grain stacked on section 19, because the granary and grain *therein* or in stack are insured, and it is stated in the application that the granary is on section 19.

These maxims should be applied to the interpretation of written instruments in all proper cases; but, after a careful reconsideration of the whole subject, we think that neither of

them can be applied in this case to restrict the language of the policy in the manner claimed. It may be, that, because the plaintiff was engaged in the business of raising grain when the policy was issued, and was not then a dealer in grain in any other way, the first of these maxims (and perhaps both of them) should be applied to limit the risk to grain acquired by him in the usual course of such business, that is, to grain raised by him. The case of *Watchorn v. Langford*, 3 Campb., 422, cited by counsel, seems to sustain such a limitation. But, for reasons which will now be briefly stated, we do not think that these maxims can be successfully invoked to create any further limitation outside of the words of the policy.

The object of these and all other canons of construction is to enable the court to ascertain and determine the real intention of the parties to the agreement or instrument under consideration. But if such intention be fully and clearly stated in the instrument itself, there is no room for construction — none whatever for the application of the maxims invoked by the learned counsel. In such a case the rule is, that, "in the absence of ambiguity, no exposition shall be made which is opposed to the express words of the instrument." Broom's Legal Maxims, 477. In a proper case this rule is paramount to and excludes all rules of mere interpretation.

In the present case the defendant insured the plaintiff against the loss, by fire or lightning, of certain property, for five years. A portion of such property, to wit, the buildings, were in existence, and are identified by a statement in the application that they are on section 19. We do not understand that such section is mentioned for any other purpose whatever. Another portion of the property insured was not in existence when the policy was issued. This is true of all the grain grown after 1870, and may be true of a portion or the whole of the live stock insured. It was deemed advisable by the parties, that as to the property insured which was not *in esse*, or which was not specifically described, some limitation of the risk should be ex-

pressed.   Hence, they inserted in the contract the limitation, in legal effect, that the risk should only extend to property in the town of Chester.   The minds of the parties met on this subject, and they did not think proper to insert in their contract any further limitation of the risk, as to the location of the stacks of grain covered by the policy.   Failing to do so, it must be held that they contracted with reference to the familiar maxim, " *expressio unius est exclusio alterius*," and that they did not intend any further limitation.   To hold otherwise would, we think, violate the maxim above quoted, in that it would be giving to the contract a construction " opposed to the express words of the instrument."   We have neither authority nor inclination to do this.

But if we are mistaken in the foregoing views — if there is any ambiguity or uncertainty in the portion of the contract upon which we have commented, rendering it necsssary to interpret the same in respect to limitations of the risk on grain in stack,— we think it apparent from other portions of the agreement that no other limitation was intended by the parties.

The printed form of the application for the insurance (which was doubtless furnished by the defendant in accordance with the usual custom) contains, immediately after the specification of the barn insured, the following: " H ay therein, or in stack *within ten rods of the farm buildings*."   " Live stock therein, or running large."   Here the defendant proposed to insert in the contract a limitation to the risk on "hay in stack," which is entirely omitted in the specification therein of " grain in stack."   This indicates very strongly that the defendant was content with the limitation in the contract which confined the risk to grain in stack in the town of Chester.   It is also additional proof that the subject of limiting its risk was fully considered by the defendant, and that all agreed limitations were inserted in the contract.

Furthermore, the insurance of the live stock is, in terms, very similar to that of grain in stacks.   Referring to the barn and

granary respectively, the language employed in the contract is, "Live stock therein or running at large." "Grain therein or in stack." If the maxim, *noscitur a sociis*, confines and limits the risk to stacks of grain on section 19, or if the maxim, *verba generalia*, etc., limits it to grain stacked on lands in the town of Chester which the plaintiff owned when the policy was issued, no good reason is perceived why the same limitations do not apply to the live stock insured. We do not see why those maxims may not be as successfully invoked to limit the risk in one case as in the other. The learned counsel says: "The grain in the granary was grain upon the premises described in the policy, and, *noscitur a sociis*, the grain in stack was intended to be grain upon the same premises also." If this be so, it must also be true that, "the live stock in the barn was live stock upon the premises described in the policy, and, *noscitur a sociis*, the live stock running at large was intended to be live stock on the same premises also." Under this construction, should the plaintiff's horse be killed by lightning within a single rod of the line of section 19, but not in that section, the defendant will not be liable on the policy for the loss. Of course no such restriction of liability was intended by the parties. The only reasonable construction of the agreement is, that if the horse was so killed at any place in the town of Chester (he being lawfully there), or at least (putting the case strongest for the defendant), at any point on the lands of the plaintiff in that town, the defendant is liable for the loss. And we see no escape from the conclusion that its liability for the loss of grain in stack is of equal extent.

But it is earnestly argued that the rule of construction which we have applied to this contract of insurance, will impose upon parties making agreements an obligation, "to think of everything, to foresee everything, and to express everything." If it could be shown that the result of our decision would be to impose upon those persons whose duty it is to prepare policies of insurance, any additional obligations to foresee future contin-

gencies, and to insert in such policies additional limitations, conditions and causes of forfeiture, we might hesitate.    An examination of the multitudinous conditions usually inserted in those instruments (and the policy before us is not an exception) may well convince a reasonable mind that the limit of human caution and foresight in that direction has been reached. But we scarcely think that our decision will have the effect predicted.    On the contrary, we think that it will neither change or unsettle the old and approved rules of law for the construction of contracts, nor render their application, in particular cases, any more difficult or doubtful.    At any rate, we have endeavored correctly to apply those rules to this contract of insurance, so far as they are applicable thereto, and by the aid thereof to ascertain the real intention of the parties; and, in so doing, we have not lost sight of another maxim, not before quoted, to wit, "*Maledicta est expositio quae corrumpit textum.*"

Our attention is particularly invited to the cases of *Gillespie v. Palmer*, 20 Wis., 544; and *Sanford v. Prentice*, 28 id., 358. The first of these cases has been subjected to the criticism that the court decided it in accordance with "the logic of the war," rather than "the logic of the law."    But, however that may be, we find nothing in it, or in any of the cases to which we have been referred, in conflict with the views above expressed.

We must, therefore, adhere to our former interpretation of the contract.

The position is now taken for the first time, that if the construction which we have given to the contract of insurance is the true one, the policy is a gambling or wager policy, and is void for that reason.

The practice of issuing policies of insurance for long terms, and upon property not *in esse*, has become very common, and our determination of this question may be far reaching in its results.    The question has not been very fully argued, and, in view of its importance, we think it should not be decided with-

out further argument. For these reasons we have concluded to order a rehearing.

*By the Court.* — Motion granted.

*L. S. Dixon,* for respondent, upon the rehearing argued:

In *Sadlers' Co. v. Badcock,* 2 Atkyns, 554, decided in 1743, Lord HARDWICKE said : " I am of opinion, it is necessary the party insured should have an interest or property at the time of the insuring and at the time the fire happens. It has been said for the plaintiffs that it is in the nature of a wager laid by the insurance company, and that it does not signify to whom they pay, if lost. Now these insurances from fire have been introduced in later times, and differ from the insurance of ships, because there interest or no interest is almost constantly inserted, and if not inserted, you cannot recover unless you have a property. The insuring of ships is as old as the laws of Oleron and Rhodes, whose inhabitants were the great traders of the world ; look into the books that treat of insuring, and you will find that the term is *aversio periculi,* the intention of all insurances being to avert any damages or loss the insured might sustain. Upon this principle, in all the modern insurances of ships, interest or no interest is introduced, and, between the subjects of different nations, for this reason, because a great deal of contraband trade is carried on, and I believe began in the Spanish trade first. The common law leant strongly against these policies for some time, but being found beneficial to merchants, they winked at it. New laws have been enacted which make it felony to destroy ships, and the temptation to do it has arisen from interest or no interest inserted in policies. No longer ago than when I first sat in the court of king's bench, I have heard these insurances called fraudulent, but though inconveniences may have arisen from these words to the insurance companies, yet some inconveniences may arise on the other side, because, if any person may insure, whether he has property or not, it may be a temptation to burn houses

to receive the benefit of the policy." In a historical point of view the still earlier, and, it is believed, one of the very earliest of the reported cases on the subject of fire insurance, *Lynch v. Dalzell*, 4 Brown's Parliamentary Cases, 431, decided in 1729, will be found interesting and instructive. Ever since the judgment of Lord HARDWICKE in *Sadlers' Co. v. Badcock*, the principles laid down by him have been looked upon as the undoubted law both in England and this country; so much so that the question of the total invalidity of fire insurance, when effected, or attempted to be, in contravention of those principles, has since been seldom mooted in the courts, or become the subject of judicial investigation in cases like the present. It seems always to have been taken for granted that a party having no interest in the subject matter or thing insured at the time he took out the policy could not effect valid insurance, and that a policy so issued was totally void, and it is only when they have been called upon to define what constitutes an interest in the subject matter which will sustain the contract of insurance, that we find the courts, incidentally as it were, declaring the general principles as above stated by Lord HARDWICKE, although every such case is a recognition in itself that where there is no interest, there can be no insurance. Thus, for example, in *Stetson v. The Massachusetts Mutual Fire Insurance Co.*, 4 Mass., 330, 337, the court say : " It is a maxim of public policy, important to good morals, and for the prevention of frauds in contracts of this nature, that gaming insurances, insurances without interest, are unlawful and of no validity. It is incumbent, therefore, upon the party claiming a loss upon a policy of insurance, to show an interest in the subject of it. and in the event insured against; and his demand must appear to be for an indemnity, and not for a wager, to become successful, as in this instance, in a public calamity." And also in *Hancox v. Fishing Ins. Co.*, 3 Sumner, 132, 142, Judge STORY says : " Then, again, it has been suggested, that the party insured must not only have an interest in the property

at the time when the insurance is made, but also at the time of the loss. This I certainly have been accustomed to consider the established doctrine, not only in American but in the English courts. It is certainly so laid down by a majority of the judges in the case of *Lucena v. Craufurd* (3 Bos. & Pull. R., 75), 1 Taunton, 325; and it has been repeatedly recognized in the American courts."

"The rule is valuable and well founded," say the court in *Sweeney v. Franklin Fire Ins. Co.*, 20 Penn. St. 337, 342, "that, he, who has no interest, can have no insurance. That he must show his interest, and that is the extreme measure of his recovery, are the corollaries of the rule. Without this, insurances would soon become a mere system of gambling." And to the same effect is the language of the court in *Ætna Ins. Co. v. Miers*, 5 Sneed, 139.

Other citations to the same general principles might without difficulty be made, but as citations must stop somewhere, and as our researches have discovered to us no authorities or even a *dictum* to the contrary, we stop with these explicit judicial declarations of the rule, that where the party insured has no interest in the subject of insurance at the time the policy issues, the policy is void in its inception, and must so remain until subsequently ratified or made valid by the acts or consent of both parties, under circumstances where the law will permit such ratification, and uphold the validity of the contract. And, as already observed, every particular case, and they are very numerous in the books and have given the courts much trouble, where the question has been what constitutes an insurable interest, is a particular affirmation of the same general principle, that where there is no interest, there can be no insurance. It may not, probably will not, become necessary for the court in this case to indicate with precision what an insurable interest must be, and yet some remarks upon this subject seem proper. In our argument in support of the motion for a rehearing of this cause, we said that insurable interest

was very like assignable interest, if not the very same thing. In many, perhaps most instances, this may be a correct test, but we accept the definition as given by Mr. Phillips, that an insurable interest need not necessarily be an assignable interest. He says: "It is not requisite, however, that the thing to which the insurance relates, or the interest of the assured, should be a species of property subject to possession or tradition, or that the interest should be that of absolute ownership, or that the subject be such as to have what is properly called a value or price, or be capable of being assigned. One may insure the life or liberty of a freeman, although a freeman, cannot be said to have pecuniary value, nor can another have any directly salable, assignable right of property in his life or liberty." 1 Phillips on Ins., § 173. "The truth is" says Judge STORY, in *Hancox v. Fishing Insurance Company, supra,* "that an insurable interest is *sui generis,* and peculiar in its texture and operation. It sometimes exists, where there is not any present property, or *jus in re,* or *jus ad rem.* Inchoate rights, founded on subsisting titles, unless prohibited by the policy of the law, are insurable; as, for example, freight, respondentia and bottomry."

The remarks of Mr. Justice LAWRENCE, in *Lucena v. Craufurd,* 5 Bos. & Pull., 295, S. C., 2 New Rep., 292, 301, have been often quoted with approbation. He observed that "insurance is a contract by which a party, in consideration of a price paid to him, adequate to the risk, becomes security for the other, that he shall not suffer loss, damage or prejudice, by the happening of the perils specified, to certain things which may be exposed to them. If this be the general nature of the contract of insurance, it follows that it is applicable to protect men against uncertain events which may in any wise be of disadvantage to them; not only those persons to whom positive loss may arise by such events occasioning the deprivation of that which they may possess, but those, also, in consequence of such events may have intercepted from them the advantage or profit

Sawyer vs. The Dodge County Mutual Insurance Company.

which, but for such events they would acquire according to the ordinary and probable course of things." The most concise, and, as it appears to us, clear and satisfactory definition of an insurable interest is, that given by Mr. Hughes, an English writer and quoted by the court in *Wiggin v. The Mercantile Insurance Co.*, 7 Pick., 271, 273. Mr. Hughes says that "to be interested is to be so situated, in regard to the thing insured, as to have benefit from its existence or prejudice from its destruction." Again he says "in general, an insurable interest must be either a right of property, or a right derivable out of some contract concerning the thing insured." Many definitions have been given or attempted by different judges and writers, each according to his own mode of expression, but it is submitted that this of Mr. Hughes is, for brevity, and at the same time comprehensiveness and accuracy, not excelled by any. The great leading case on the subject of what constitutes an insurable interest is that of *Lucena v. Craufurd*, above cited, where it was said that the mere naked expectation of acquiring a trust or charge respecting property without a scintilla of present interest, either absolute or contingent, in possession, reversion, or expectancy, in the proper legal sense of the word, can be no foundation for an insurable interest, and that an expectation of a grant or trust or possession, founded upon great probability, is not an insurable interest, nor would it be, whatever might be the chances in favor of the expectation. The plaintiffs in error there were commissioners by statute, with authority to take possession of and to care for, manage, sell, or otherwise dispose of, to the best advantage, the ships and cargoes which were the subject of the insurance, and they had a contingent interest founded on the statute, viz : their commission, which was held to be insurable. Speaking of the same case, the supreme court of the United States say that, "the interest of the plaintiffs amounted to nothing but a power over the subject, with a claim by *quantum meruit*, for their services." *Buck v. The Chesapeake Ins. Co.*, 1 Peters, 151, 163. The case was an extreme one, calling for

accurate discrimination, and yet the interest of the assured in the preservation of the ships and cargoes, or their loss by reason of their destruction, cannot be doubted.

Other cases involving subtle distinctions and nice shades of difference have also arisen, notable among which are *Hancox v. Fishing Ins. Co.*, *supra*, and *Putnam v. Mercantile Ins. Co.*, 5 Met., 386. In the latter case (p. 394) the court say : " The case at bar, indeed, stands on the very borders of the line — which may be deemed almost shadowy — where interest ends and expectation begins; but the line, however thin, must be drawn somewhere, or the difference between wager policies and those coupled with an interest must cease. And, upon consideration, we are of opinion, that the regular consignee of goods has an interest in his expected commissions, equivalent to that of expected profits, and that such commissions are the lawful subject of insurance." " A bare possibility that a right to property might hereafter arise, cannot be considered an insurable interest," is the language of the court in *Macarty v. Commercial Ins. Co.*, 17 La., 365. The following is a synopsis of the case, *Davies v. Home Ins. Co.*, 27 Upper Canada Queen's Bench R., 54, decided 1867 : " Assured sold the goods to C., to whom the policy was assigned with company's consent ; C. sold them to M., and, on M.'s notes in part payment, L. was accommodation indorser, on a verbal agreement that the proceeds of the goods should be paid to L. to retire the notes with, and the policy should be assigned to L. to secure him, which was done with the company's consent. *Held*, no recovery could be had ; for L. had no insurable interest in the goods, and M. being a stranger to the policy, it could not inure to his benefit." In another case in the court of chancery of the same province, where a person bought from a wharfinger 3,500 bushels of wheat, part of a larger quantity, and paid for it, but the wheat had not been separated from the rest, it was held that he had no insurable interest in the wheat. *Rex v. Provincial Ins. Co.*, 15 Grant's Ch., 337, 552. The ground of this decision

clearly must have been that no title to the wheat passed by the supposed sale, but that the same remained in the wharfinger, who was the sole and absolute owner, and who alone could insure. See also *Lazarus v. Commonwealth Ins. Co.*, 5 Pick., 76 ; *Gordon v. Mass. F. & M. Ins. Co.*, 2 id., 249 ; *Carroll v. Boston Marine Ins. Co.*, 8 Mass., 515 ; *Lazarus v. Commonwealth Ins. Co.*, 19 Pick., 81 ; *Niblo v. North Am. Ins. Co.*, 1 Sandf., 551 ; *Warren v. Davenport Fire Ins. Co.*, 31 Iowa, 464 ; *Miltenberger v. Beacom*, 9 Pa. St., 198 ; *Catron v. Tennessee Ins Co.*, 6 Humph., 176 ; *Columbian Ins. Co. v. Lawrence*, 2 Pet., 25. The attention of the court is particularly directed to the remarks of Chief Justice MARSHALL, found on page 49 of the last report. If, as the chief justice says, the extent of the interest of the assured must always influence the underwriter in taking or rejecting the risk, in cases where the assured has some interest, but less than or different from that through ignorance or mistake represented, how much more shall the underwriter be influenced by the fact that the assured has no interest whatever in the subject of the insurance ? In *Watson v. Swann*, 103 E. C. L. (11 J. Scott, N. S.), 756, which was a marine risk, the action being upon an open or running policy similar to that under consideration before this court in *Strohn v. The Hartford Fire Ins. Co.*, 33 Wis., 648, the insurance being declared by the parties effecting it to be made as well in their own names as for and in the name or names of all and every other person or persons to whom the same doth, may, or shall appertain, etc., it was held that to entitle a person to sue upon the contract, it must be shown that he himself made it, or that it was made *on his behalf* by an agent authorized to act for him *at the time*, or whose act has subsequently been ratified and adopted by him ; and the person for whom the agent professes to act *must be capable of being ascertained at the time.* It was decided in that case that the plaintiff, not being such a person, although interested and a sufferer by the loss of goods of the kind described in the policy, and apparently covered by it, could

not maintain an action against the underwriters upon the policy, the contract not having been made by him or on his behalf *at the time.*

It has been argued in this case that the parties to this contract could not by possibility have contemplated or had in mind the stacks of wheat in question, indemnity for the destruction of which the plaintiff here seeks to recover, at the time the policy was issued, but this position has been overruled by this court, and it is now judicially established that the parties did contemplate these very same stacks of grain when they entered into the contract, and that the same were then, and are now, for the purposes of this action, to be considered as the true and proper subject of the insurance mentioned in the policy, and intended by the parties at the time of making it. The court so applies the language, because it says that the parties so understood and intended it to be applied at the time the policy was issued. This proposition being settled, it seems to us to follow unavoidably, from the authorities above cited, that the policy was so far void in its inception, and that nothing has since occurred to cure the defect or give it any additional force or validity. If the stacks of grain had been at that time in actual existence as things which had issued out of the land, and which belonged to the owner of it by virtue of his ownership or title to the land (as, for the purposes of sale, assignment or insurance, they may be supposed to have existed potentially, as things to issue out of the land, and which were the property of the owner of it at the time of issuing the policy, by virtue of the same ownership or title), there can be no doubt, we think, that for a loss then or soon after occurring, or occurring before the plaintiff bought the land, of stacks of wheat grown upon it and described, or intended to be, in the policy, there could have been no recovery by the plaintiff in an action upon the policy. The policy would then have been a purely wager policy, and void. As a policy of insurance upon stacks of grain having a potential existence, but in which

JANUARY TERM, 1875. 533

Sawyer vs. The Dodge County Mutual Insurance Company.

the plaintiff had no possible interest of any kind at the time, and not even a hope or expectation of interest, it was then and is now absolutely void. See *Dodge v. Hopkins*, 14 Wis., 630, 637. And where a policy of insurance is void for want of interest, no subsequently acquired interest by the holder will give him a right to sue upon it, unless the underwriter gives his consent, and agrees that the contract may be so ratified. It suffices to say that the plaintiff *Sawyer* had no interest of any kind in the land, and so was totally disconnected in interest with anything of an insurable nature to issue out of it. In *Sweeney v. The Franklin Ins. Co.*, *supra*, it was held that one who was a stockholder and creditor of an unincorporated company which erected a house on land belonging to the state of Delaware, without license or shadow of title from the state, had no insurable interest in the house, though he claimed by relinquishment and transfer from most of the stockholders to the creditors, and was in possession at the time of his effecting the insurance and of the destruction of the premises. With respect to the insurance of things not *in esse*, there must be at the time a *right in esse* from which the things insured are derivable, like the right or title of the owner of the land from which the future crop, the property insured, is to be derived, and which serves to give the crop a potential existence. All insurances of this nature must be founded on a right *in esse*, from which the property insured proceeds, or is expected to be derived. "A policy upon goods and their proceeds," says STORY, J., 3 Sumner, *supra*, 137, "is a policy which covers the original goods, while they remain subject to the risks in the policy, and any other property, in which the proceeds of those goods are invested, when subjected to the like risks." It is true in that case that the policy contained the words, "and the proceeds thereof," but it is doubtless likewise true that by the usage of underwriters and of merchants, a policy without those words would be extended to cover future goods, the proceeds of the original ones acquired and

held in the ordinary way and subjected to the same risk, such appearing to have been the understanding and intention of the parties.

Now, with the exception of cases like the above, where the future property or goods of the party insured are held to be covered by the policy because of his present ownership or right *in esse* to the goods or property out of which the future goods and property are to issue, and which in some sense and for the purposes of the contract are looked upon as the same goods and property originally insured, we believe that there is no authority to be found in support of the position that after-acquired goods or property, with respect to which the assured has, at the time of taking the policy, no hope or expectation of interest founded on a then existing right or contract or title to or ownership of goods or property then held by him, and to which the language of the policy immediately applies, can become or be made the lawful and proper subject of insurance. The policy of insurance, if operative at all, must operate immediately upon its execution and delivery, unless restrained by some express condition, and, when operative, it must be upon some existing subject which, if not in actual existence, may be said to exist potentially, and in which the assured has at the time some interest, and which subject is also at the same time capable of ascertainment. The contract of insurance cannot be without its subject, definite and ascertainable at the time of making it, and if that subject be things *in esse*, they must be capable of immediate identification, or, if not *in esse*, they also must be capable of identification from the standpoint of the parties when the contract is made, so that it may be then known and foretold, from the description and location, what those things will be when they come into actual existence. A policy of insurance must, therefore, like every other contract, and in order to be a contract at all, have its subject reasonably definite and capable of ascertainment at the time it is made, and an underwriter cannot to-day bet with an individual

having no interest, actual or potential, no hope or expectation founded on a right *in esse*, that such individual will not own three stacks of grain next year, or, if he does, that such stacks will not be destroyed by fire, and have such bet enforced by action in a court of justice. Neither can the individual, if he does chance to own the stacks, and they do happen to be thus destroyed, enforce the wager for their value by suit against the underwriter. But this court has held that the subject of this contract is not uncertain, and that it can ascertain, and has ascertained with definiteness and precision, by looking upon the policy, that the stacks of grain in question, or others grown upon the same land, were the identical stacks contemplated by the parties at the time, and which *Mr. Sawyer* intended to insure, and upon which the defendant company intended to assume the risk ; and this being the interpretation, it follows from the authorities above cited, and all others of which we have any knowledge, that it was a wager policy, and void on that ground.

*Elwell & Lander*, for appellant:

" A wager policy is one in which it appears by its terms that the insured has no interest, or, in other words, runs no risk. It is a mere bet, and is known by the insertion of certain clauses, — such as without further proof of interest than the policy, "interest or no interest," having for its object "to relieve the insured from the necessity of proving his interest in case of loss." May on Ins., 30. Whether a policy be a wager or not, depends on the whole instrument, and to render a policy a wager it must appear to be such on its face. 1 Phill. on Ins., 5–6 ; *Cousins v. Nautes*, 3 Taunt., 513. A wager policy is defined to be, " one in which the parties, by express terms, disclaim on its face the intention of making a contract of indemnity." 1 Arnold on Ins., 276. To be a wager policy it must be in respect to a subject that the insurance upon it is contrary to the spirit and general principles, or what is called the policy of the law. *Mount v. Waite*, 7 Johns.,

434. *Ruse v. Ins. Co.*, 23 N. Y., 523. None of the elements of crime or immorality, or any principle against public policy, entered into the contract of insurance in this case. The policy is merely a contract of indemnity, and its sole purpose being to guaranty against loss or damage to the insured. The statute against wagers, bets, etc., R. S. ch. 169, secs. 16, 17 and 18, excepts any insurance "made in good faith for the security or indemnity of the party insured." As stated by this court: "The practice of issuing policies of insurance for long terms, and upon property not *in esse* has become very common." See May on Ins., 76; *Grant v. Parkinson*, 3 Bos. & Pull., 85; 3 Kent, 275; *Lucena v. Craufurd*, 5 Bos. & Pull., 302 to 304. Policies are frequently made in reference to future interests, and it is every day's practice to insure goods before they are bought. 1 Phill., §§ 172 to 180. *Rhind v. Wilkinson*, 2 Taunt., 237. And if the property passes to the insured before the loss happens the policy attaches. *Rowley v. Bigelow*, 12 Pick., 307. And the assured may sell and replace his entire stock as often as his own interest may require, and the policy protects whatever goods may chance to be on hand when the fire occurs. *Wolfe v. Security Ins. Co.*, 39 N. Y., 49, and cases cited; *Hoffman v. Ætna Ins. Co.*, 32 id., 405. And in *Hooper v. Hudson River Ins. Co.*, 15 Barb., 414, and affirmed in 17 N. Y., 424, which was a policy "on the stock of looking glasses, looking glass plates, frames, machines, tools, and materials for the manufacture of the same," the court says: "But the insurance in this case was not upon such goods only as were in the building at the time when the policy was issued or continued. It was upon personal property of the assured and their assigns, of the description contained in the policy which might be in such building at any time during the period mentioned in the policy." And further on it is said: "So, if the machinery had been worn out, or even sold, and other machinery for a similar purpose been substituted, that would have been protected by the insurance." It is not requisite or necessary that the as-

sured should have an assignable interest in the property insured. 1 Phill., § 173. Crops to be raised are an exception to the general rule that title to property not in existence cannot be affected so as to vest the title when it comes into being. In the case of crops to be sown, it vests potentially from the time of the executory bargain, and actually as soon as the subject arises. *Andrew v. Newcomb*, 32 N. Y., 417; *Butt v. Ellett*, 19 Wall., 544. 2 Am. Law Reg. (N. S.), 527. In treating upon the subject of an "insurable interest," Mr. May, page 76, says: "It may be said generally, however, that while the earlier cases show a disposition to restrict it to a clear, substantial, vested pecuniary interest, and to deny its applicability to a mere expectancy without any vested right — the tendency of modern decisions is to relax the stringency of the earlier cases, and to admit to the protection of the contract whatever act, event, or property bears such a relation to the person seeking insurance that it can be said with a reasonable degree of probability to have a bearing upon his prospective pecuniary condition." Counsel argued that the usage had long prevailed of issuing policies, as in this case, and that public policy required that they should be upheld. That they had been issued and taken in good faith, and many interests would suffer if the policies were to be held void.

RYAN, C. J. The eminent gentleman who represented the respondent on the motion for rehearing and on the rehearing of this appeal, seems unreconciled to our construction of his client's policy. Though the question was not left open on the rehearing, we have, in deference to his persistent dissent, again looked into the policy; and we do not see how we could have given it a different construction, without disregarding old rules of construction or inventing new ones for the exigencies of the case. And, after all, it seems to us that his complaint should go to his client rather than to the court, for the gist of it is more that the policy ought not to read as we read it, than that

it does not. The policy defines its own limits, which we could not change because they are said to be inconvenient. If insurance companies would exercise like skill in the manuscript of their policies as — perhaps not always fairly (*Ins. Co. v. Slaughter*, 12 Wall., 404; *Fuller v. Ins. Co.*, 36 Wis., 599) — in the printed conditions, they might avoid such occasions of scolding courts for reading their risks as they write them.

We ordered a rehearing of the appeal, in order to hear discussed at the bar a difficulty first suggested on the motion: that the policy, as we construe it, is a wager policy and void. We suppose that insurance companies have a right to make that objection to their policies, at the risk perhaps — if successful — of *quo warranto*. And we shall consider the proposition, without regard to its good faith. It is grave and difficult. As LYON, J., said in granting the rehearing : " The practice of issuing policies of insurance for long time and upon property not *in esse*, has become very common ; and our determination of this question may be far reaching in its results."

The appellant is a farmer, cultivating his own land. After he took his policy, which is an open one, he purchased in the same town, but not adjoining his former land, another small piece which he also cultivated, and on which he raised and stacked the grain lost by fire. And it is claimed, that because he did not own this land at the date of the policy, he had not insurable interest in the grain ; and that the policy, applying to it, is gaming insurance and void. The question was argued with great learning and ability. It is not one of conflicting authorities. It turns rather on the proper application of admitted principles. The cases cited will appear in the report of the argument ; and we propose to consider the principles and their application rather than the cases in detail.

A radical difficulty, perhaps, which has led to more or less confusion in distinguishing what are gaming policies, is that insurance is essentially a wager ; upheld for indemnity, avoided

for gaming, but always a wager; so plainly recognized in our law. R. S., ch. 169, secs. 16–18.

There has long been an effort at distinction between what are called interest policies and wager policies, which has not always been very happy. For policies have been upheld which look like mere wagers; and policies have been held for wagers, which would go only to indemnify the assured. The rule of distinction was, perhaps, too arbitrary, and did not always operate justly. And it is, perhaps, to this cause, as well as to change in the usages of business, that later relaxation of older rules is to be attributed.

" An interest policy is one which shows by its form that the assured has a real, substantial interest; in other words, that the contract of insurance, embodied by the policy, is a contract of indemnity, and not a wager. A wager policy is one which shows on the face of it that the contract it embodies is really not an insurance, but a wager; a pretended insurance founded on an ideal risk, where the assured has no interest in the thing insured." Arn. Ins., 17.

In marine insurance, there was long disregard of the gaming character of the contract; and policies, interest or no interest, were tolerated. But in fire insurance, there was always a policy to limit the gaming character of the contract and to confine it to indemnity, by requiring an interest or property in the thing insured, at the time of insurance and at the time of loss. *Sadlers' Co. v. Badcock*, 2 Atkyns, 554.

It will be perceived at once that this rule is not a very happy one for its object. For it avoids policies strictly for indemnity, when title happens to follow insurance in order of time ; and it sanctions insurance on interest in anything ; soon held to include things *in posse*, mere expectancies, little distinguishable from pure wagers.

This rule has never been wholly abandoned. Indeed, it is still constantly asserted, while its application is often relaxed and sometimes evaded. The extent, variety and intricacy of

business into which insurance enters, in late times, has so greatly modified the convenience of the latter, that what is now insurable interest has became too vague and too subtle for definition by such jurists as Judge Story and Mr. Phillips, as cited by the respondent's counsel. The truth is, that the present practice of insurance, to a great extent, has outgrown and is not consistent with the broad principle of property or interest in the thing insured at the time of insurance.

Whether the present scope of fire insurance tends to public good or evil, may be doubted. In *Fuller v. Ins. Co.*, decided early in this term, we had occasion to remark that: "It is little to say that the very general habit of insurance against fire has led to great carelessness. The destruction of property by fire and the consequent loss to the commonwealth have been probably increased largely by insurance." But we have no power to reform it. We can only apply to it, as it is, as well as we can, the principles governing it which we find in the books.

Whether it might be wise or unwise to recur to the strict rule of property or interest in the thing insured at the time of insurance, need not be considered. The current of judicial decision has run too long and too strongly in favor of distinctions and evasions devised to accommodate modern usages of business, to leave that possible, as was frankly admitted by the learned counsel of the respondent.

And we are not willing, as we were invited, to apply the general principle arbitrarily to every policy, not taken out of it by some particular adjudication; blindly enforcing the rule and refusing to enforce it, in cases not distinguishable in principle. We must find, if we can, the grounds on which the exceptions rest, in order to determine whether the policy in this case be under the rule or within the exceptions.

We do not know where the rule and the reason of it are better stated than by SEWALL, J., in *Stetson v. Ins. Co.*, 4 Mass., 330: "It is a maxim of public policy, important to

good morals and for the prevention of frauds in contracts of this nature, that gaming insurances, insurances without interest, are unlawful and of no validity. It is incumbent, therefore, on a party claiming a loss upon a policy of insurance, to show interest in the subject of it; and his demand must appear to be for an indemnity, and not for a wager, become successful, as in this instance, by a public calamity."

It may be worth notice, in passing, that in his statement of the reason of the rule, the learned judge rests it on the presence or absence of interest, not on the time of acquiring interest; not that he did not understand the importance of time in the rule, but that it did not suggest itself to his mind in giving the logic of the rule.

And when we consider what is now held for insurable interest, we see at once how the practice of insurance upheld by the courts has outgrown the strictness of the rule of property or interest in the thing insured at the time of insurance, held in *Sadlers' Co. v. Badcock*, and the earlier cases. Says LAWRENCE, J., in *Lucena v. Craufurd*, 5 Bos. & Pull., 269 : "Interest does not necessarily imply a right to the whole or a part of the thing, nor necessarily and exclusively that which may be the subject of privation, but the having some relation to or concern in the subject of the insurance." Says Phillips, sec. 173 : "It is not requisite, however, that the thing to which the insurance relates, or the interest of the assured, should be a species of property, subject to possession or tradition, or that the interest should be that of absolute ownership, or that the subject should be such as to have a value or price, or be capable of being assigned." Says STORY, J., in *Hancox v. Ins. Co.*, 3 Sumner, 132 : "I am not aware that any decision has been made, by which it has been established that an interest ceases to be insurable in the progress of a voyage, simply because it is subject to contingencies, or has not at the moment anything corporeal or tangible to which it is attached. What, indeed, upon such an interpretation, would become of insurance upon

profits or commissions or freight, which are in the course of being earned? One difficulty of the argument is in likening an insurable interest to any other interest in property. The truth is that an insurable interest is *sui generis*, and peculiar in its texture and operation. It sometimes exists where there is not any present property or *jus in re* or *jus ad rem*."

When insurable interest is held not to imply right in the thing insured or *jus in re* or *jus ad rem*, to be *sui generis* and unlike any other interest in property, to be not necessarily of value or assignable, it needs little consideration to perceive that the latitude of interest emasculates the rule.

Still some of the conditions might be restricted to actual things, subsisting property; the insurable interest *in posse*, but the subject *in esse*. But that limit is also rejected. Says Judge STORY, *ubi supra*: "Inchoate rights founded on subsisting titles, are insurable." Says Arnould, 230: "An expectancy, coupled with a present existing title to that out of which the expectancy arises, is an insurable interest."

When it appears that the subject of insurance, once called the thing insured, may be inchoate rights, expectancies, incapable of possession or tradition, not corporeal or tangible, of no value, the question suggests itself, what does the latitude of insurable interest and the latitude of the subject of insurance, leave of the rule of interest in the thing insured at the time of insurance, or of the reason of the rule? For it appears that interest in one thing *in esse* will support insurance of another thing *in posse*, an expectancy from the thing *in esse*. There cannot be present title in nonentity. One thing may produce another; and the owner of the former become the owner of the latter, when produced and not before. Yet insurable interest, interest in the thing insured at the time of insurance, may be interest *in posse*, in a thing *in posse*, when the expectancy is founded on interest in another thing.

In this state of the law, well might the supreme court of Massachusetts exclaim, that the line where interest ends and

expectation begins is almost shadowy.    *Putnam v. Ins. Co.*, 5 Metc., 386.

It would be waste of time to discuss the extent of this effectual evasion of the principle of *Sadlers' Co. v. Badcock* and *Stetson v. Ins. Co.*

But so far, a subsisting interest of some kind, in something, is required; and the appellant could have valid insurance on his expectancy of crop from land owned at the time of insurance, but not from land acquired pending the policy.    It is easy to understand how insurance of his future crop, ungathered, ungrown, unsown, should be held a wager policy.    But when the law has made his expectancy of crop insurable interest, it is more difficult to understand how the date of his title to the land from which the crop is to come can make his insurance more or less gaming.    In the ordinary sense of gaming, it is in the chance, and the chance is in the crop.    And when interest is made the test of wager policies, it is interest in the thing insured: interest in the crop, which is purely speculative: equally speculative, whether title to the land come before or after policy issued, or come at all.    For interest in the crop attaches only when the crop is raised, and attaches equally whenever and however the land is acquired from which it is raised.    But be that as it may, if the relaxation of the rule stopped where we left it, the appellant's policy, as applicable to his loss, would be, within the authorities, a wager policy and void.

But great as is the latitude so far considered in the application of the rule of insurable interest at the time of insurance, it is manifest that it still falls short of supporting large classes of policies in the present practice of insurance.    The goods of merchants, manufacturers, warehousemen and the like, often insured against fire, are necessarily and constantly changing pending the policies upon them; and the interest of the assured in them accrues only upon purchase or possession.    The insured have no title in the source from which the goods pro-

ceed; not even a naked expectancy of the goods *in specie*, which may not be *in esse* at the date of insurance. And the insurance, at its date, is of a naked probability, resting on no title or interest, direct or indirect, immediate or remote, inchoate or contingent. And such insurance would be clearly void under the general rule. May Ins., sec. 78.

And yet, notwithstanding the *dictum* that "the bare possibility that a right to property might hereafter arise cannot be considered an insurable interest" (*McCarty v. Ins. Co.*, 17 La., O. S., 365), the convenience of business requires such insurance, and open policies of that character are constantly upheld to cover subsequent purchases of goods. Phill. Ins., § 491; Angell Ins., § 203; *Lane v. Ins. Co.*, 12 Me., 44; *Cushman v. Ins. Co.*, 34 id., 487; *Hooper v. Ins. Co.*, 17 N. Y., 424; *Hoffman v. Ins. Co.*, 32 id., 405; *Wolfe v. Ins. Co.*, 39 id., 49; *Bonner v. Ins. Co.*, 13 Wis., 677; *Keeler v. Ins. Co.*, 16 id., 523; *Pupke v. Ins. Co.*, 17 id., 378; *Fitzsimmons v. Ins. Co.*, 18 id., 234.

It is not a little remarkable that this great change in the law of insurance seems to have come about with little struggle or attention. Courts seem to have fallen in, without hesitation, with the changed necessities of trade, and took little trouble to discuss the grounds of so great a departure from the old rule. A weak attempt was sometimes made to reconcile the rule and the exception, by the suggestion that goods added to a stock are proceeds of goods sold from it. We take it that this is not always true in fact; and as it is not required to be pleaded or proved, the change of rule cannot rest on it. The cases are a departure from the old rule, forced upon the courts by the changing usages of life, and for which the subtle evasions of the rule in previous adjudications had well prepared the way.

These cases wholly dispense with insurable interest in the goods insured at the time of insurance, and plainly stand beyond "the very borders of the line, which may be deemed almost shadowy, where interest ends and expectation begins," fulfilling

the foreboding that, so far and in that sense of wager policies, " the difference between wager policies and those coupled with an interest must cease." · *Putnam v. Ins. Co., supra.* For the same thing may come successively under several contemporaneous policies, wholly independent of interest at the time of insurance. Wheat, for example, may be covered by the insurance of the farmer who raises it, of the produce man who buys it, of the miller who grinds it, of the merchant who sends the flour to market, of the dealer who retails it, and of the consumer till he eats it; and all their policies may precede the sowing of the crop.

This class of cases proceeds, perhaps, on the authority of *Rhind v. Wilkinson*, 2 Taunt., 237, followed in this country by such cases as *Haven v. Gray*, 12 Mass., 71; *Whitney v. Ins. Co.*, 3 Cowen, 210; *Dow v. Ins. Co.*, 1 Hall, 166. The rule in *Rhind v. Wilkinson* goes upon what is there stated to be every day's practice, to insure goods on a return voyage long before the goods are bought, and is, that it is enough if the interest of the assured accrue previous to the commencement of the risk. It is easy to apply this rule to new goods purchased by a dealer, in his course of business; the risk not attaching to the goods until they are brought under the policy.

Be that as it may, *Rhind v. Wilkinson* and the cases following it substitute interest at the time of the commencement of the risk for interest at the time of insurance. It is said that interest at a day previous to the commencement of the risk is immaterial. That was marine insurance. There the risk began with the voyage. In fire insurance, on movable goods, the risk begins when the goods are brought within the terms of the policy. And perhaps the cases upon fire policies of merchants, etc., go no farther in principle, though they seem to rest on interest at the time of loss.

And whatever evils may possibly arise from these relaxations of the old rule, it is not seen how they admit what are called wager policies as distinguished from interest policies; for the

policies which they uphold go strictly to indemnity. And it may be doubted, after all, whether interest at the time of loss, without interest at the time of insurance, may not be as good a protection against gaming policies as both were under the old rule.

In the present case, the policy is for five years, covering grain in stacks and granary, for five successive crops. It is conceded, under the authorities cited, that he had insurable interest in the five years expectancy of grain *in posse*, to be raised on the land which he owned at the time of insurance; but it is claimed that so far as the policy covers grain to be raised from land which he did not then own, it is *pro tanto* wager insurance, void as against public policy. It is easy to understand the distinction between expectancy founded on title and expectancy not founded on title; but it is more difficult to appreciate how the two relations of the policy, to land owned and land not owned at its date, differently affect public policy, or to understand how such an insurance is distinguishable in principle from a merchant's or manufacturer's.

Insurance on the stocks of merchants, mechanics and the like, is insurance on the material of their industry, and may in some sort be regarded as insurance on the industry itself. In that light, interest in the industry might be taken as insurable interest at the time of insurance, in the expectancy of the material, although actual interest in that come after. Whether that be so or not, we find it difficult to understand how or why the law of insurance should favor one industry more than another. It is a merchant's business to buy and sell goods; a manufacturer's, to make fabrics from raw material; a farmer's, to raise produce from the earth. The merchant may have valid insurance covering all goods he may have on hand from time to time during the life of his policy; the manufacturer, covering all the raw material he may have on hand and all the fabrics he may make from time to time during the life of his policy. These do not rest on interest in the goods at the time of insur-

ance; but perhaps on the course of business. The merchant's goods may not yet be manufactured, and the manufacturer's raw material may be growing in forests or hidden in the bowels of mines to which he is a stranger. These policies being upheld, on what principle is an agriculturist excluded from the same protection of his industry, in his course of business; from valid insurance on the grain which he may raise and have on hand from time to time during the life of his policy, without regard to his title at the time of insurance? On what principle is his insurance on his productions to be limited by his title at time of insurance, and not the manufacturer's or mechanic's? We confess that we are unable to perceive how or why a policy in the one case should be held a wager policy, forbidden by law, and policies in the others upheld as proceeding on insurable interest.

There may be, and presumably are, mechanics and manufacturers without other capital than their skill. So there may be, and presumably are, farmers not owning land. On what principle can the former be upheld in insuring in advance, by open policies, the products of their industry, and not the latter?

It is noticeable in the policy before us, that, contrary to common usage, there is no question asked or warranty given of title. Certainly, so far as it relates to grain, the insurance does not purport to rest on the appellant's title to realty. We cannot hold it limited by the extrinsic fact of what realty the appellant was seized or not seized at the date of the policy. And we see no reason why it should not operate as valid insurance for indemnity of grain, the product of his industry, in the course of his business as a farmer. We must, in principle, uphold such policies, if we are to continue to uphold those of merchants and manufacturers. The truth is that the authorities have made the exceptions, practically, broader than the rule; and we are disposed to hold fire insurances on time, by open policies, of the future material production of the assured, in the course of his business, in his trade or calling, within

the exceptions, and valid contracts for indemnity, not wager policies.

*By the Court.* — The judgment of the court below is reversed, and the cause remanded for a new trial.